1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT FOR THE

7                    EASTERN DISTRICT OF CALIFORNIA

8

9  EQUAL EMPLOYMENT OPPORTUNITY    )      No. CV-F-06-165 OWW/TAG
   COMMISSION,                     )
10                                 )      ORDER DEFERRING PLAINTIFF-
                                   )      INTERVENORS' MOTION FOR
11                                 )      CLASS-CERTIFICATION PURSUANT
              Plaintiff,           )      TO FRCP 23(a) AND 23(b)(2)
12                                 )      (Doc. 41) AND DENYING
         vs.                       )      DEFENDANT'S MOTION FOR
13                                 )      SUMMARY ADJUDICATION WITHOUT
                                   )      PREJUDICE (Doc. 51)
14 KOVACEVICH "5" FARMS,           )
                                   )
15                                 )
              Defendant.           )
16                                 )
17 _____)

18        On February 13, 2006, the Equal Employment Opportunity

19 Commission (EEOC) filed a Complaint against Kovacevich "5" Farms

20 (K5) pursuant to Title VII of the Civil Rights Act of 1964 and

21 Title I of the Civil Rights Act of 1991 alleging unlawful

22 employment practices on the basis of sex and seeking relief on

23 behalf of six charging parties: Patricia Delgado, Myriam Cazares,

24 Flor Rivera, Miriam Delgado, Terri Salcedo, and Delia Casas.  The

25 EEOC's Complaint alleges in paragraph 9: "Since at least January

26 of 1998, Defendant have [sic] engaged in unlawful practices of

                                  1

1  sex discrimination ... by refusing to hire the Charging Parties
2  and similarly situated female employees based on their sex."
3  The charging parties named in the EEOC's Complaint have
4  intervened in this action as Plaintiff/Intervenors (hereinafter
5  referred to as Intervenors).   The Intervenors allege claims for
6  sex discrimination in violation of Title VII and for sex
7  discrimination in employment in violation of the Fair Employment
8  and Housing Act (FEHA), California Government Code §§ 12900 *et*
9  *seq.*

10      Intervenors move for class certification pursuant to Rule
11  23(a) and (b)(2), Federal Rules of Civil Procedure, of the
12  following class, described in paragraph 4 of the Complaint in
13  Intervention:

14          (a) All women who applied for employment with
            Defendant Kovacevich "5" Farms and who were
15          denied employment because of their gender
            (female) at any time during the period from
16          January 1998 to the present.

17          (b) All women who were deterred from applying
            for or seeking employment with Defendant
18          Kovacevich "5" Farms, at any time during the
            period from January 1998 to the present,
19          because of the company's known policy and
            practice of refusing employment to females
20          because of their gender.

21      The EEOC has filed a Statement of Non-Opposition to the
22  motion.   In its Statement of Non-Opposition, the EEOC asserts
23  that certification of the two classes from January 1998 to the
24  present is appropriate because of application of the continuing
25  violation doctrine.

26      Kovacevich "5" Farms (K5) has filed an opposition to the

2

motion and a reply to the EEOC's Statement of Non-Opposition, contesting application of the continuing violation doctrine. Because Plaintiff-Intervenors did not address the merits of this issue in their reply brief, Plaintiff-Intervenors were ordered to file a supplemental reply brief. *See discussion infra*. K5's objection to class certification essentially is limited to the temporal scope of the class.

Subsequent to the filing of the motion for class certification, K5 filed a motion for summary adjudication, seeking an order "limiting individual damages sought under Title VII by the EEOC and the Intervenors to individuals who can show that they were denied employment or deterred from applying from a date 300 days prior to the filing of Intervenors EEOC charges (February 13, 2003) to the present, and limiting damages sought by Intervenors under the California Fair Employment and Housing Act (FEHA) to individuals who can show that they were denied employment or deterred from applying from a date one year prior to the filing of Intervenors EEOC charges (December 12, 2002) to the present."

At the hearing on these motions, the parties were ordered to file supplemental briefs addressing whether the issue raised by K5 is appropriate for resolution on summary adjudication and whether there is no statute of limitations period applicable to individual claims when alleged in a pattern or practice case. These supplemental briefs were timely filed.

A.   **Motion for Summary Adjudication**.

1         **1.  <u>Temporal Scope of Class</u>**.

2         The Charges of Discrimination filed by Terri Salcedo on

3    November 13, 2003 and by Delia Casas on November 19, 2003 allege

4    in pertinent part that Ms. Salcedo and Ms. Casas with a group of

5    women applied for work with K5 "in or about July, 1998", that K5

6    employees told Ms. Casas and the other women that K5 does not

7    hire women, and that "[i]n the following seasons, including 2003

8    (up and through the present), [they were] deterred from applying

9    for work at Kovacevich because [they] knew about the policy of

10   refusing to hire female workers [and they] believed that

11   Kovacevich would reject [them] again based on my sex."  The

12   Charge of Discrimination filed by Miriam Cazares on November 19,

13   2003 alleges in pertinent part that she and two other women

14   applied for work with K5 "in or about July, 2001", that they were

15   told by a K5 employee that K5 was not hiring at the time, that K5

16   was hiring men at the time, that K5 refused to hire them because

17   of their sex, and that "[i]n the following seasons, including

18   2003 (up to and including the present), I was deterred from

19   applying for work at Kovacevich because I knew about the policy

20   of refusing to hire female workers [and] I believed that

21   Kovacevich would reject me again based on my sex."

22        The EEOC and Intervenors argue that the continuing violation

23   doctrine is applicable to a systemic policy or a pattern-or-

24   practice of discrimination and that evidence in addition to that

25   set forth in the Charges of Discrimination provided in discovery

26   substantiates this contention.

4

1    In its motion for summary adjudication, K5 assumes *arguendo*

2 that it had a policy against hiring women and that there were

3 zero women in the work force but contends that only those women

4 who can prove that they were refused hire because of their gender

5 and those who were deterred from applying for an available

6 position within the 300-day period and/or the one year period

7 immediately preceding the filing of the EEOC charges of

8 discrimination are eligible to recover damages.  K5 asserts that

9 its motion does not address factual issues but, rather, "K5 asks

10 the court to rule on who may bring timely individual claims for

11 monetary damages, if the EEOC succeeds on its theory of

12 liability".  K5 contends, as a matter of law, the only actionable

13 claims in this case are those that arose during the applicable

14 charge filing period, and damages can only be awarded on those

15 claims.

16        **2.  Governing Standard.**

17    Summary judgment is proper when it is shown that there

18 exists "no genuine issue as to any material fact and that the

19 moving party is entitled to judgment as a matter of law."

20 Fed.R.Civ.P. 56.

21        **3.  Factual Background.**[1]

22    K5's Answer to the First Amended Complaint filed in

23 *Gutierrrez v. Kovacevich "5" Farms,* No. CV-F-04-5515 OWW/DLB,

24 _____

25        [1]Although K5 does not dispute the facts set forth for purposes
   of its motion for summary adjudication, K5 reserves the right to
26 dispute these facts later in this litigation.

admits that it is a single integrated enterprise, to grow, pick, pack and ship table grapes and other crops in Tulare County, California.  K5's position statement submitted to the EEOC in connection with the charges of discrimination filed in the instant action states, "[t]he Company's labor needs fluctuate depending upon seasonal activities, with peak employment levels occurring in the harvest during late summer and early fall"; that K5 "has highly informal hiring procedures in seasonal operations"; and that "[f]arm workers are generally aware of the seasonal activities that occur in the table grape [industry] and will begin to inquire as to the availability of work when those seasonal activities begin."  K5's Employee Handbook states that K5 "does not utilize a seniority system and the company does not guarantee any laid off employees to recall rights."  In K5's responses to Requests for Admission, Set One, K5 admits the number of its employees during the period 1998 to 2003 ranged from 277 to 301.  The Joint Scheduling Report states that it is "undisputed by the parties that K-5 had no female employees from 1998 to October 2003".  K-5's response to the Charges of Discrimination filed with the EEOC states "there were 95 female applicants in October 2003."  In the Declaration of Lucio Arciniega, a crew boss for K5 submitted to the EEOC in connection with its investigation, Mr. Arciniega averred in pertinent part:

> 5.  My job duties include supervising and overseeing a crew of farm laborers in seasonal agricultural activities.  I hire the employees for my crew.

6.   When people ask me for work, I consider
their past work history with the Company,
their past performance and whether their
abilities are suited for the job that I need
done.  If the person has no work history with
the Company, I hire the person who asks for
work first.

7.   I have refused to hire female applicants
who have asked for work when no positions are
available in my crew.  I have never refused
to hire a woman because she was female, and
have never told any one that I would not hire
women.

8.   When I need workers for my crew, I will
either tell the people in my crew that more
jobs are available and they will spread the
word, or I will call however many people I
need from a list of people who have worked in
my crew in the past.  I call one or two
times, and will leave a message if I can.

9.   In 2003, some employees started asking
that the Company hire their wives.  As I was
instructed by management, I told my crew that
women were welcome to seek work, and asked
for the names of women who wished to work.  I
prepared a list of names of female
applicants, and provided it to the office.
The office chose names of women, and I was
told to hire those women.  If a woman was
unavailable, I was provided with another
name.  Ultimately, both wives and daughters
of employees were hired.

Onecimo Calderon, a crew boss for K5, averred in pertinent part:

6.   When I hire employees, I consider whether
the person has worked for the Company in the
past, and whether or not the person has been
a good worker.  If the person has no work
history, I hire the people on a first come,
first served basis.

7.   I have refused to hire female applicants
who applied when there were no available jobs
in my crew.  When this happens, I tell them
to check back later to see if work is
available.  I have never turned away a woman
because she was female, and have never told

7

1      any applicant that I do not hire women.

2          8.  Most of the people in my crew live near
           me.  If I only need a small number of
3          workers, I may call each person that I need
           from those who have worked in the crew in the
4          past.  If I need a large number of workers, I
           will call as many as I can, but sometimes the
5          workers are difficult to reach because their
           phone numbers change frequently.  I leave
6          messages when I can, but many workers do not
           have message machines.  I will call one or
7          two times when I need people.  I do not
           remember any woman approaching me to seek
8          work at a time when work was available.

9          9.  During 2003, some of the workers asked me
           if their wives could work at the Company.  I
10         was instructed by management to prepare a
           list of women who wanted to work for the
11         Company.  I announced to my crew that women
           would be hired, and they provided me with
12         names for the list.  The office selected the
           names of the women who would be hired and
13         gave them to me.  I then informed the
           employees who gave me the names and asked
14         them to let the women know that I had a job
           for them.  If the woman was unavailable, the
15         office provided me with a new name.

16     Augustin Castillo, a crew boss for K5, averred in pertinent part:

17         6.  When I hire employees, I prefer employees
           who have worked for the Company in the past
18         and who have a history of good performance.
           Most of the employees in my crew are
19         employees who have worked for the Company in
           the past.  When I hire applicants who have
20         not worked for the Company before, I will
           hire the first person who seeks work when
21         work is available.

22         7.  I have turned away female job applicants
           when they have asked for work at times when
23         no work is available.  I have never refused
           to hire a woman because she was female, and
24         have never told any person that I do not hire
           women.

25
           8.  I almost always have at least a small
26         crew working.  When I am told by management

                        8

1
2
3
4
5
6
7
8
9
10
11
12

       to hire more workers, I will tell the members
of the crew, and they spread the word that
work is available.  Those who are interested
in working will come to my house or to the
fields to ask for work.  If there are no crew
members working, I will call a few people who
have worked before and inform them that work
is available.  They will spread the word, and
people will come to my house or show up at
the fields to seek work.  The people that I
select to call are those for whom I have good
contact information.  Many of the people in
my crew are difficult to contact by
telephone, or move frequently.  Those who I
know I can contact are the people that I
call.  I usually will try two or three times
to reach these people, and I ask them to
spread the word that work is available.  I
never call each and every employee that I
need, and I never seek out the people.  If
they want to work, they must find me.  I do
not recall a woman ever asking me for work at
a time when work was available.

13
14
15
16
17
18
19
20
21

       9.  In 2003, a number of employees approached
me and asked if their wives could work for
the Company.  I was told by management that
the Company would hire any woman who wished
to work, and I informed the crew.  The
members of the crew gave me the names of
women who wished to work for the Company, and
I gave a list of these names to management.
The office selected the names of women I was
to hire, and gave me a list of these names.
I was not involved in the selection process.
I told the men in my crew who gave me the
women's names that I had jobs for them, and
they told me whether or not the woman was
available.  If a woman was available, she was
hired, and if not, I was given another name.

22
23
24

In the Declaration of Manuel Hernandez, submitted in opposition

to K5's motion for summary adjudication,  Mr. Hernandez avers

that he has worked as a farmworker at K5 since 1985 and further

avers in pertinent part:

25
26

       Prior to October 2003, I never saw a woman
get hired by K-5.  However, I did hear that

several years ago a woman disguised herself
as a woman [sic] in order to get work at K-5.
When the crew leader found out she was a
woman, she was immediately fired.  Other than
that, I don't know of any woman that was ever
hired during my twenty-two years with the
company.

4.  I heard that the owners did not want
women workers because there were no bathrooms
for them, women should stay home with their
children and because women would want time
off from worker [sic] for things like taking
their kids to the doctors.

5.  I wanted my wife and daughters to work
with me at K-5 and over the years when work
was available I repeatedly asked the crew
leaders if they could work.  I was told by a
crew leader that the owners did not want
women workers.  I saw that the crew leaders
would only offer work to men.  Numerous co-
workers confirmed to me that the company did
not hire women.  And again, I never saw a
woman working there prior to October 2003.

6.  All the employees' wives and daughters
preferred working at K-5 because of the
proximity to their home, less transportation
and safer.

7.  When the company finally decided to
consider women for work, the crew leaders'
wives and daughters were among the first to
be hired.  I think that the crew leaders
wanted to hire women, including their female
relatives, but could not do so before October
2003 because the owners directed them not to
hire women.

In the Declaration of Yolanda Hernandez, wife of Manual
Hernandez, it is averred:[2]

1.  I have worked as a farmworker my entire
life.  I have specifically worked in grape
vineyards since the age of 14 years old and

---

[2]The Declaration of Yolanda Hernandez electronically filed
with the court is not signed.

have performed many duties related to the production of grapes including deleafing, pruning, tipping, and picking.

2.  Five of my male relatives have worked and continue to work at K-5 for many years, including my husband, Manuel ....

3.  I am fully aware of the seasonal cycles for farm work including grape vineyards in the Delano-Earlimart area because my income depends on it.  I also know in particular when K-5 has work available because I have so many family members working there.

4.  I first sought work at K-5 in 1998, when I along Delia Casas, Myrian Cazarez, Terri Salcido, Adela Hernandez, Isabel Hernandez, Eva Hernandez, Rachel Ramirez, Maria Rocha and some other women walked to K-5 to ask for employment.  We knew that K-5 was hiring from friends and relatives.

5.  We spoke with Kenny Kovacevich, Sr., and his two sons, Kenny Jr. and Mark Kovacevich. We told them we had experience working in the vineyards and wanted to apply for work. Kenny Kovacevich, Jr., stated that the company did not employ women.  When we asked why the Kovacevichs said that we needed to be home with our kids.  The men then got a truck and drove away.  They left us standing there in the dust.

6.  I have wanted to work at K-5 so that I could work with my husband and other relatives.  Working together costs the family expenses and provides a safer work environment.

7.  Over the years, I hoped that the owners would change their mind about women, so I would continue to ask my husband and other men who worked at K-5 if they were hiring women.  However, until late 2003, I was repeatedly told that the owners still did not want to hire women workers.

Evidence from K-5's payroll records demonstrates that at least

two of the Charging Parties were rejected for work at K5 on July

11

23, 2003 but that 20 men were hired from July 24, 2003 to August 4, 2003, all of whom were first time hires.  Mark Kovacevich testified at his deposition that the door of a bathroom was marked for women in approximately October 2003.  Linda Ordonio-Dixon, counsel for the EEOC in this action, avers:

> 16.  Only limited discovery has been conducted in this case thus far.  No depositions have been taken and the parties have only recently begun to identify the victim class in this case.  However, the EEOC is informed and believes that subsequent discovery will reveal numerous other victims of K-5's exclusionary policy.  Even at this stage of the lawsuit, the EEOC has interviewed no less than fifty women who have potential claims in this lawsuit.  Each of these potential claimants experienced discrimination similar to that which is detailed above.

## 4.  **Analysis**.

K5 asserts that the proposed class definition is defective on its face because of the time covered by the class definition.  Specifically, K5 challenges the request that the class run from January 1998.

K5 cites 4 Larson, Employment Discrimination, 2d Ed., § 81.09[2], that "courts follow an initial rule that the class may include only those individuals whose claims are not foreclosed by the Title VII statute of limitations and who therefore could have filed charges with the EEOC in a timely manner on the date that the actual class representative filed charges."  K5 contends that, under federal and state authority, the temporal scope of the class is limited to those who were unlawfully denied

12

employment or who were deterred from applying during the 300-day period to file a charge of discrimination with the EEOC for the Title VII causes of action and to the one-year period for filing DFEH charges for the FEHA cause of action.  Therefore, the class can include only those who were alleged victims of sex discrimination on or after February 15, 2003 for Title VII and on or after December 12, 2002 for the FEHA claim.

K5 relies on *Williams v. Owens-Illinois*, 665 F.2d 918 (9th Cir.), *modified on denial of rehearing*, 1982 WL 308873 (9th Cir.), *cert. denied*, 459 U.S. 971 (1982).  In *Williams*, the Ninth Circuit held in pertinent part:

> In a class action, a class representative's EEOC complaint tolls the statute of limitations for all class members ... The trial court established the limitations period for the two classes by subtracting the 180 day statute of limitations for filing with the EEOC complaint filed by a member of each class.  The court therefore concluded that claims of sex discrimination based on acts prior to March 1974 and of race discrimination based on acts prior to March 1971 were time-barred.  The court rejected the continuing violation doctrine as inapplicable.
>
> The doctrine of continuing violations, as one court observed, is 'actually a conglomeration of several different ideas.' ... For present purposes, however, the relevant strain of continuing violation doctrine is that a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period ... The reason is that the continuing system of discrimination operates against the employee and violates his or her rights up to a point in time that falls within the applicable limitations period.  Such continuing violations are most

13

likely to occur in the matter of placements or promotions. A minority employee who is not promoted in 1973, for example, and is subject to a continuing policy against promotion of minorities, may then file a timely charge in 1976, because the policy against promoting him or her continued to violate the employee's rights up to the time the charge was filed. With regard to such discrimination in promotion, this court has accepted the following formulation:

> [A] challenge to systematic discrimination is always timely if brought by a present employee, for the existence of the system deters the employee from seeking his full employment rights or threatens to adversely affect him in the future.

...

The situation may be different, however, with regard to complainants who have ceased to be employees or never were employees. A refusal to hire or a decision to fire an employee may place the victim out of reach of any further effect of company policy, so that such a complainant must file a charge within the requisite time period after the refusal to hire or termination, or be time-barred. If in those cases the victim can show no way in which the company policy had an impact on them within the limitations period, the continuing violation doctrine is of no assistance or applicability, because mere 'continuing *impact*' from past violations is not actionable. Continuing violations are.'

....

We agree with the trial court that in this case Owens-Illinois' refusals to hire and terminations did not give occasion to apply the continuing violations doctrine. Claims based on discriminatory refusals to hire or on terminations occurring before the limitations period were therefore properly excluded.

665 F.2d at 923-924.

14

1     K5 also refers to *Domingo v. New England Fish Co.*, 727 F.2d
2  1429 (9th Cir.1982), *order modified*, 742 F.2d 520 (9th Cir.1984).

3     In *Domingo*, the district court certified the plaintiff class
4  as all nonwhites who were either employed by Nefco, applied for
5  employment by Nefco, or were deterred from applying for
6  employment with Nefco at any time between 300 days prior to
7  November 26, 1971 (the date Domingo filed his charge with the
8  EEOC) and the date of the damages phase of the trial.  727 F.2d
9  at 1442.  In pertinent part, Domingo argued on appeal that the
10  continuing violation theory permits victims of discrimination at
11  an earlier time to recover.  The Ninth Circuit held that the
12  district court was correct in establishing the starting date of
13  the class action 300 days prior to the date Domingo filed his
14  EEOC charge.  *Id*.  The Ninth Circuit held in pertinent part:

15          It is now well settled that a named plaintiff
            who has filed a timely charge may bring a
16          class action on behalf of class members who
            have not filed charges ... In addition, the
17          filing of a class action suspends the
            applicable statute of limitation for all
18          class members ... It follows, then, that
            Domingo may represent all class members whose
19          claims were not already time-barred at the
            time he filed his charge, irrespective of
20          whether the class members had filed charges
            of their own.

21          ...

22          Domingo argues, nevertheless, that the
            continuing violation doctrine announced in
23          this circuit operates to eliminate the
            limitation period.  The continuing violation
24          theory recognizes the principle that a
            plaintiff may be able to recover under Title
25          VII if he or she can demonstrate a pattern or
            practice of discrimination that has continued

26

15

into the present, notwithstanding his or her ability to prove specific instances of discrimination personally suffered at the hands of the defendant within the limitation period of Title VII ... Thus, Domingo reasons, if a continuing violation has been demonstrated a class member should be able to recover regardless of when the class member was employed.  That statement is not quite true.

We note, first, that the defendant's conduct, as found by the district court, did indeed constitute a continuing violation of Title VII.  In order for a violation to be continuing, it must involve a practice, continued over a period of time, which operates to injure the plaintiff either individually or as a member of a class to which the plaintiff belongs ... Here, plaintiffs have attacked Nefco's hiring and promotion policies.  There is no question that these policies remained intact from season to season.  Moreover, the practices were not confined in application to any particular individual or group of individuals, but operated against the class generally.  Indeed, the district court implicitly found, as a matter of fact, that Nefco's practices were classwide in application when it certified the class under Fed.R.Civ.P. 23(b)(2).

Domingo's argument, however, would effectively read the limitations period out of the statute, which we cannot do.  As the Supreme Court has stated:

> A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed.  It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

16

> *United Air Lines v. Evans*, 431 U.S. 553, 558
> ... (1977).  The continuing violation theory
> is a way of introducing this type of
> background evidence ... It follows that, as a
> prerequisite to obtaining relief, each class
> member must demonstrate, by fact of
> employment or otherwise, that he or she has
> been discriminated against during the
> limitation period or was a member of a group
> exposed to discrimination during that time.

727 F.2d at 1442-1443.

With regard to the FEHA, K5 cites *Alch v. Superior Court*, 122 Cal.App.4th 339, 377 (2004)("[T]he employers and the agencies would not be liable for any discriminatory refusal to refer or refusal to hire that occurred more than one year before the complaints in these cases were filed with the Department of Fair Employment and Housing.').

In *Morgan v. National Railroad P. Corp.*, 232 F.3d 1008 (9th Cir.2000), the Ninth Circuit ruled that plaintiff can establish a continuing violation in two ways:

> ... First, by showing a series of related
> acts one or more of which are within the
> limitations period - a serial violation.  A
> serial violation is established if the
> evidence indicates that the alleged acts of
> discrimination occurring prior to the
> limitations period are sufficiently related
> to those occurring within the limitations
> period ... Precedent makes clear that the
> alleged incidents of discrimination cannot be
> isolated, sporadic, or discrete ... [T]his
> court [has] found a sufficient relationship
> where the acts were 'plausibly related as
> acts of discrimination ....' ....

> The second way to establish a continuing
> violation is to show a systematic policy or
> practice of discrimination that operated, in
> part, within the limitations period - a
> systemic violation ... Systemic violations

17

1                        involve 'demonstrating a company wide policy
or practice' and most often occurs in matters
2                        of placement or promotion.

3  232 F.3d at 1015-1016.  However, in *National Railroad P. Corp. v.*

4  *Morgan*, 536 U.S. 101 (2002), the Supreme Court granted certiorari

5  and rejected the Ninth Circuit's application of the continuing

6  violation doctrine to "serial violations".  The Supreme Court

7  held:

8                        The Court of Appeals applied the continuing
violation doctrine to what it termed 'serial
9                        violations,' holding that so long as one act
falls within the charge filing period,
10                      discriminatory and retaliatory acts that are
plausibly or sufficiently related to that act
11                      may also be considered for purposes of
liability ... With respect to this holding,
12                      ... we reverse.

13                      Discrete acts such as termination, failure to
promote, denial of transfer, or refusal to
14                      hire are easy to identify.  Each incident of
discrimination and each retaliatory adverse
15                      employment decision constitutes a separate
actionable 'unlawful employment practice.'
16                      Morgan can only file a charge of
discrimination to cover discrete acts that
17                      'occurred' within the appropriate time
period.
18
  536 U.S. at 114.  However, *Morgan* specifically did not address
19
  the timely filing question with respect to "pattern-or-practice"
20
  claims brought by private litigants.  536 U.S. at 115 n.9.
21
       Although noting that the Supreme Court in *Morgan* expressly
22
  declined to address the timely filing with respect to "pattern-
23
  or-practice" claims, K5 asserts that another statement in *Morgan*
24
  suggests that only timely discrete acts are actionable under a
25
  pattern or practice theory.
26

The statement in *Morgan* upon which K5 relies is not supportive as K5 argues.  The Supreme Court was addressing Morgan's contention that the statute does not require the filing of a charge of discrimination within 180 or 300 days of each discrete act of discrimination, but that the language requires the filing of a charge within the specified number of days after an "unlawful employment practice".  536 U.S. at 510-511.  In rejecting Morgan's position, the Supreme Court stated that "[t]here is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purpose of timely filing" and that "[w]e have repeatedly interpreted the term 'practice' to apply to a discrete act or single 'occurrence,' even when it has a connection to other acts."  536 U.S. at 511.  This latter statement was made by the Supreme Court in rejecting the Ninth Circuit's position concerning "serial violations".  Given the Supreme Court's express statement in *Morgan* that it was not addressing timely filing questions with respect to "pattern-or-practice" claims brought by private litigants statement, K5's assertion that the Supreme Court in *Morgan* suggests what the resolution might be is speculative.

Nonetheless, in *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1192 (9th Cir.2003), the plaintiff, a substitute teacher, alleged in pertinent part that the School District subjected her to disparate treatment because of her national origin when it refused to hire her as a permanent

teacher during three consecutive hiring cycles, beginning in

1991.  The Ninth Circuit held in pertinent part:

> In *Morgan*, the [Supreme] Court drew a
> distinction between harassment-based and non-
> harassment-based claims under Title VII:
> plaintiffs may not establish employer
> liability for events occurring prior to the
> statutory limitations period in non-
> harassment-based claims, even if events
> occurring outside of the limitations period
> form part of a pattern extending to events
> that are not time-barred.  *Morgan*, 122 S.Ct.
> at 2072 (stating that 'discrete
> discriminatory acts are not actionable if
> time barred, even when they related to acts
> alleged in timely filed charges'); *see also
> id*. at 2071 ('We have repeatedly interpreted
> the term "practice" to apply to a discrete
> act or single "occurrence," even when it has
> connection to other acts.').  In other words,
> a discriminatory practice, although it may
> extend over time and through a series of
> related acts, remains divisible into a set of
> discrete acts, legal action on the basis of
> which must be brought within the statutory
> limitations period.
>
> Here, Raad filed her EEO charge with the
> ASCHR on September 16, 1993.  Because she
> filed her charge with the state agency, the
> 300-day limitations period governs her claim.
> Therefore, the District may be held liable
> only for discriminatory acts perpetrated
> within 300 days of September 16,1993,
> counting backward from that date.  As a
> result, Raad's claims based on the District's
> denial of her full-time application in August
> 1993 for the science position at Lathrop, as
> well as her claims based on the report of a
> bomb threat and ensuing disciplinary action,
> are not time-barred.  The District may be
> held liable for damages caused by these acts,
> assuming that Raad is able to prove her case.
>
> The failure-to-hire claims arising out of
> Raad's applications in 1991 and 1992 are
> time-barred; however, their supporting
> factual allegations may remain relevant to
> Raad's live claims.  *See Morgan*, 122 S.Ct. at

20

> 2072; *United Airlines, Inc. v. Evans*, 431 U.S. 553, 558 ... (1977).  Accordingly, while these claims are not independently actionable, evidence about the District's refusal to hire Raad for a full-time teaching position in 1991 and 1992 is relevant and admissible insofar as it bears on her claim that she was discriminatorily refused a full-time position in August 1993.

323 F.3d at 1192.

K5 further contends that the Supreme Court's decision in *Teamsters v. United States*, 431 U.S. 324 (1977) establishes that persons seeking individual recovery in pattern or practice cases must demonstrate that they have an actionable claim under Title VII.  In so arguing, K5 refers to the Supreme Court's discussions at pp. 361-362, 367-368, and 371.

In *Teamsters*, the United States instituted federal court actions under Title VII against a nationwide common carrier of motor freight and the union representing many of its employees, alleging that the employer had engaged in a pattern of discrimination against African-Americans and Spanish-surnamed persons with regard to hiring for and transfers or promotions to certain preferred truck driving positions, and that the seniority system in the bargaining agreement between the defendants perpetuated the effects of past discrimination.  In pertinent part, the defendants (petitioners before the Supreme Court) then argued that no employee should be entitled to relief unless the United States demonstrates that he was an actual victim of the company's discriminatory policies.  The Supreme Court, relying *Franks v. Bowman*, 424 U.S. 747 (1976), and cautioning that not

21

all class actions will necessarily follow the *Franks* model, held

in pertinent part:

> The plaintiff in a pattern-or-practice action
> is the Government, and its initial burden is
> to demonstrate that unlawful discrimination
> has been a regular procedure or policy
> followed by an employer ... At the initial,
> 'liability' stage of a pattern-or-practice
> suit the Government is not required to offer
> evidence that each person for whom it will
> ultimately seek relief was a victim of the
> employer's discriminatory policy.  Its burden
> is to establish a prima facie case that such
> a policy existed.  The burden then shifts to
> the employer to defeat the prima facie
> showing of a pattern or practice by
> demonstrating that the Government's proof is
> either inaccurate or insignificant. ....

> If an employer fails to rebut the inference
> that arises from the Government's prima facie
> case, a trial court may then conclude that a
> violation has occurred and determine the
> appropriate remedy.  Without any further
> evidence from the Government, a court's
> finding of pattern or practice justifies an
> award of prospective relief ....

> When the Government seeks individual relief
> for the victims of the discriminatory
> practice, a district court must usually
> conduct additional proceedings after the
> liability phase of the trial to determine the
> scope of individual relief.  The petitioners'
> contention in this case is that if the
> Government has not, in the course of proving
> a pattern or practice, already brought forth
> specific evidence that each individual was
> discriminatorily denied an employment
> opportunity, it must carry that burden at the
> second, 'remedial' stage of trial.  That
> basic contention was rejected in the Franks
> case.  As was true of the particular facts in
> Franks, and as is typical of Title VII
> pattern-or-practice suits, the question of
> individual relief does not arise until it has
> been proved that the employer has followed an
> employment policy of unlawful discrimination.
> The force of that proof does not dissipate at

22

the remedial stage of the trial.  The
employer cannot, therefore, claim that there
is no reason to believe that its individual
employment decisions were discriminatorily
based; it has already been shown to have
maintained a policy of discriminatory
decisionmaking.

The proof of the pattern or practice supports
an inference that any particular employment
decision, during the period in which the
discriminatory policy was in force, was made
in pursuit of that policy.  The Government
need only show that an alleged individual
discriminatee unsuccessfully applied for a
job and therefore was a potential victim of
the proved discrimination.  As in Franks, the
burden then rests on the employer to
demonstrate that the individual applicant was
denied an employment opportunity for lawful
reason.

... [W]e have held that the District Court
and the Court of Appeals were not in error in
finding that the Government had proved a
systemwide pattern and practice of racial and
ethnic discrimination on the part of the
company.  On remand, therefore, every post-
Act minority group applicant for a line-
driver position will be presumptively
entitled to relief, subject to a showing by
the company that its earlier refusal to place
the applicant in a line-driver job was not
based on its policy of discrimination.

431 U.S. at 361-362.  The Supreme Court subsequently discussed

the appellate court's conclusion that where there has been a

showing of class-wide discriminatory practices coupled with a

seniority system that perpetuates the effects of that

discrimination, an individual member of the class need not show

that he unsuccessfully applied for the position from which the

class had been excluded.  The Supreme Court held:

[A]n incumbent employee's failure to apply
for a job is not an inexorable bar to an

23

award of retroactive seniority.  Individual
nonapplicants must be given an opportunity to
undertake their difficult task of proving
that they should be treated as applicants and
therefore presumptively entitled to relief
accordingly.

431 U.S. at 364.  In reaching this conclusion, the Supreme Court
stated in pertinent part:

To conclude that a person's failure to submit
an application for a job does not inevitably
and forever foreclose his entitlement to
seniority relief under Title VII is a far cry
... from holding that nonapplicants are
always entitled to such relief.  A
nonapplicant must show that he was a
potential victim of unlawful discrimination.
Because he is necessarily claiming that he
was deterred from applying for the job by the
employer's discriminatory practices, his is
the not always easy burden of proving that he
would have applied for the job had it not
been for those practices ... When this burden
is met, the nonapplicant is in a position
analogous to that of an applicant and is
entitled to the presumption discussed ...
supra.

431 U.S. at 367-368.  The Supreme Court further held:

While it may be true that many of the
nonapplicant employees desired and would have
applied for line-driver jobs but for their
knowledge of the company's policy of
discrimination, the Government must carry its
burden of proof, with respect to each
specific individual, at the remedial hearings
to be conducted by the District Court on
remand.

431 U.S. at 371.

K5 argues that *Teamsters* makes

absolutely clear that, notwithstanding an
alleged pattern or practice of
discrimination, each person seeking
individual relief must demonstrate an
actionable claim of discrimination under

24

> Title VII, and it is equally clear that to
> demonstrate an actionable claim requires
> proof of a discriminatory refusal to hire or
> legitimate deterrence during the 300 days
> preceding the filing of the underlying EEOC
> charge.  In this case, therefore, the class
> can only include individuals who can prove
> that they were refused hire, or legitimately
> deterred from applying for work on or after
> February 13, 2003.

The EEOC and Intervenors rely on *EEOC v. Local 350, Plumbers and Pipefitters*, 998 F.2d 641 (9th Cir.1992).  In *Local 350*, the EEOC brought an action under the ADEA on behalf of a local union member, Pilot, and similarly situated members challenging the union's policy of refusing to allow retired members to seek work through its hiring hall while receiving pensions.  Pilot, who had retired in 1983, had signed on to the union's work list in 1984. The union removed him from the work list in 1984, advising him that to be eligible he would have to stop receiving his pension. Pilot continued to seek to sign up on the work list up to November 1987.  In December 1987, Pilot filed a discrimination charge with the EEOC.  *Id.* at 643.  The Ninth Circuit accepted the EEOC's argument that Pilot could obtain monetary relief from the date he was first refused listing because the union's policy constituted a "continuing violation":

> 'Under the continuing violation doctrine, "a
> systematic policy of discrimination is
> actionable even if some or all of the events
> evidencing its inception occurred prior to
> the limitations period."'

*Id.*  Here, the EEOC and Intervenors argue, K5 continued its exclusionary hiring policy into the charge filing period and,

following *Local 350*, K5 "should be held accountable for the entire scope of its systematic discrimination for the duration of the policy's implementation."

K5 responds that *Local 350* is distinguishable because Pilot had been refused listing within one month of the EEOC charge of discrimination and because *Local 350* was decided before the Supreme Court's opinion in *Morgan*.  K5 contends:

> [T]here was a continuing obligation to refer the applicant for employment which could support a continuing violation, at least prior to *Morgan*, due to the continuing relationship between the applicant and the union.  Of course, *Morgan* eviscerated this approach to alleged continuing violations, by holding that the limitations period begins to run from the date of each discrete discriminatory act, such as a refusal to hire.

The EEOC and Intervenors also refer to *Douglas v. California Dept. of Youth Authority*, 271 F.3d 812 (9th Cir.), *amended*, 271 F.3d 910 (9th Cir.2001), *petition for rehearing en banc denied*, 285 F.3d 1226 (9th Cir.), *cert. denied*, 536 U.S. 924 (2002). *Douglas* was a case involving a suit claiming discrimination under the Americans with Disabilities Act and the Rehabilitation Act by an applicant for employment who was denied employment by CYA because a vision test indicated the applicant was color-blind. The Ninth Circuit, relying on its opinion in *Morgan v. Nat'l R.R. Passenger Corp.*, held that a plaintiff "may show a 'systematic policy or practice of discrimination that operated, in part, within the limitations period - a systemic violation.'" 271 F.2d at 822.  The *Douglas* court was aware that the Supreme Court had

26

granted *certiorari* in *Morgan* but concluded that "[b]ecause the

present case involves the second method of establishing a

continuing violation - a systemic violation - the Supreme Court's

decision is unlikely to control this case."  271 F.3d at 822 n.9.

The Ninth Circuit, addressing Douglas' allegation that CYA's

color vision requirement constitutes a systemic policy of

discrimination, explained:

> A systemic violation claim 'requires no
> identifiable act of discrimination in the
> limitations period, and refers to general
> practices or policies, such as hiring,
> promotion, training and compensation.'
> *Provencher v. CVS Pharmacy, Div. of Melville
> Corp.*, 145 F.3d 5, 14 (1st Cir.1998).  'In
> other words, if both discrimination and
> injury are ongoing, the limitations clock
> does not begin to tick until the invidious
> conduct ends.'  *Mack v. Great Atl. & Pac. Tea
> Co.*, 871 F.2d 179, 183 (1st Cir.1989).

271 F.3d at 822.  The Ninth Circuit, noting that its decisions

applying the systemic policy or practice method of demonstrating

a continuing violation have largely arisen in the context of

placement or promotion discrimination cases, stated that *Douglas*

presented a case where the plaintiff alleges discrimination in

hiring and considered whether "the maintenance of a systemic

discrimination policy, when combined with repeated efforts by the

plaintiff to gain employment, extends the accrual of the

limitations period.  *Id.* at 822-823.  After discussing the

specific facts relative to the statutes of limitation applicable

to Douglas' claims, the Ninth Circuit referred to *Domingo v. New

England Fish Co.*, *supra*, and *EEOC v. Local 350, Plumbers and*

27

*Pipefitters*, *supra*, and ruled:

> Thus, under *Domingo* and *Local 350*, the critical inquiry is whether in this case, Douglas has introduced facts, which if viewed in the light most favorable to him, raise material questions about whether he was 'exposed' to CYA's discriminatory policy during the period of limitations.  We conclude that Douglas raised material questions of fact about whether CYA continued to discriminate against him by not considering or responding to his pending application during the 1996-1998 period. When Douglas applied in 1994, he proceeded successfully through each of the hiring steps, until he reached the vision test at the end.  We have no reason to believe that Douglas was less qualified when he re-applied in 1996.  It is a reasonable inference from these facts that CYA failed to respond to Douglas's 1996 application throughout the 1996-1998 period because of its discriminatory policy about the vision test. In any event, by reapplying in the fall of 1996 during the window for applications for hiring in 1996-1998, Douglas remained 'exposed' to CYA's discriminatory vision policy during the entire 1996-1998 period. This exposure renders his claims timely by extending the claims past the June 22, 1996 deadline for filing his ADA claim, and the July 5, 1997 deadline for filing his Rehabilitation Act claim.

271 F.3d at 824.  In *Douglas,* the Ninth Circuit further noted:

> We need not decide the broader question whether the maintenance of a systematic policy of discrimination *alone* is enough to extend the limitations period for a failure to hire case.  We note that the Fifth Circuit has answered this question in the negative, reasoning that '[i]f the mere existence of a policy is sufficient to constitute a continuing violation, it is difficult to conceive of a circumstance in which a plaintiff's claim of an unlawful employment policy could be untimely.'  *Abrams v. Baylor Coll. of Med.*, 805 F.2d 528, 533 (5th Cir.1986).  In our view, this rationale

28

> ignores the fact that the employer may end
> the period of exposure to litigation by
> disavowing the discriminatory policy.

271 F.3d at 823 n.10.

K5 argues that *Douglas* is distinguishable because Douglas could show that he had been denied employment due to the discriminatory policy within the 300-day period.  In addition, as in *Local 350*, there was a continuing relationship between Douglas and CYA as evidenced by the two-year application period, "until the *Morgan* decision eliminated continuing violations in refusal to hire cases."  K5 contends:

> While the [Ninth Circuit in *Douglas*] did not
> address the scope of available remedies, such
> a factual scenario is clearly distinguishable
> from the case presented here.  Even by the
> EEOC's version of the facts, K5 maintains a
> highly informal hiring process where there
> are no written applications, much less ones
> that are retained for multiple years with the
> right to appeal hiring decisions.  Thus,
> there is nothing 'continuing' about the
> application process at K5 that can support a
> continuing violation, and of course, after
> *Morgan*, it is clear that refusals to hire
> cannot be a continuing violation.

The EEOC and Intervenors also refer to *Lyons v. England*, 307 F.3d 1092, 1106-1107 (9th Cir.2002):

> ... We must conclude from the [Supreme]
> Court's statements [in *Morgan*] that when ...
> a plaintiff pursues several disparate
> treatment claims, based on discrete
> discriminatory acts, the limitations period
> will begin to run for each individual claim
> from the date on which the underlying act
> occurs. [footnote omitted].  If a plaintiff
> chooses to bring separate claims based on
> each discriminatory act, his assertion that
> this series of discrete acts flows from a
> company-wide, or systematic, discriminatory

29

> practice will not succeed in establishing the
> employer's liability for acts occurring
> outside the limitations period because the
> Supreme Court has determined that each
> incident of discrimination constitutes a
> separate actionable unlawful employment
> practice.

However, in *Lyons*, the Ninth Circuit further noted:

> We do not mean to suggest that after *Morgan*
> the same plaintiff would be precluded from
> bringing a class-wide pattern-or-practice
> claim based on a series of discrete acts,
> including, for example, separate incidents of
> an employer's failure-to-train and failure-
> to-promote the plaintiff because of his
> membership in a protected class.   In
> *International Brotherhood of Teamsters v.
> United States*, 431 U.S. 324 ... (1977), the
> Supreme Court held that the government
> successfully proved its case of pattern-or-
> practice discrimination based on the
> employer's 'refusal to recruit, hire,
> transfer, or promote minority group members
> on an equal basis with white people,' *id.* at
> 335,336 ... The Court noted in *Morgan* that it
> 'ha[d] no occasion [] to consider the timely
> filing question with respect to "pattern-or-
> practice" claims brought by private
> litigants.' ... Therefore, the question of
> how Title VII's filing deadlines should be
> applied to pattern-or-practice claims based
> on a series of discriminatory acts, some of
> which occurred outside the limitations
> period, has been left unanswered by the
> Court, and we do not consider it here.

The EEOC and Intervenors also refer to *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir.2003).  In *Cherosky*, the Ninth Circuit rejected the plaintiffs' attempt to assert that an employer's individual denials of respirators for asthma was a pattern-or-practice claim:

> ... Although the terms 'pattern-or-practice'
> are not defined by statute, we have held that
> these terms have their ordinary meaning ...

30

> As the Supreme Court explained, pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 ... (1977).
>
> Here, the Employees have not attempted to show, by argument let alone with statistical or any other evidence, that the Postal Service widely discriminates against employees with disabilities or even that it routinely discriminates with respect to respirator requests.

330 F.3d at 1247.

The EEOC and Intervenors contend that the evidence to be presented in this case will focus on statistical evidence of K5's failure to hire women and will establish that this failure was systematic and company-wide.

The EEOC and Intervenors argue that the Supreme Court's opinion in *Morgan* supports a finding of a "continuing violation" in this case.  The "continuing violation" is K5's policy of excluding women from the workplace, resulting in repeated failures to hire women, "as well as discrimination in the form of on-going deterrence from application for employment at K-5 because of its policy of excluding women from employment."  The EEOC and Intervenors assert: "Unlike the rejection of an actual applicant, a deterred applicant suffers continuous discrimination not manifested in a specific act."  They refer to the discussion in *Morgan* of the difference between "discrete acts" of discrimination and "hostile environment" claims:

31

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct ... The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own ... Such claims are based on the cumulative effect of individual acts.

*Morgan*, 536 U.S. at 115. The EEOC and Intervenors contend:

> Systemic cases are comparable to hostile work environment cases because they are both comprised of a series of acts that constitute a specific type of violation. As with a hostile work environment claim, a claim of pattern and practice systemic discrimination cannot be said to occur on any particular day. It occurs over a series of days, months and perhaps years ... Thus, it is unsurprising that the Supreme Court left the door open for continuing violation claims based on pattern and practice systemic discrimination which is manifested in such a way. Indeed, the very nature of such a claim requires a court to look beyond the 300-day limit. Just as in hostile environment claims, proof of a violation in pattern and practice case [sic] will require a showing that a policy or practice existed over time.

K5 responds that this attempt to draw an analogy between deterrence and hostile work environment claims is "misguided", arguing that deterrence is a discrete act and is not analogous to a hostile work environment claim. K5 asserts that "[c]ase law reveals that there is no difference between the claim of an applicant rejected due to a discriminatory policy, and the claim that an individual was deterred from applying for an open position", citing *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265(11th Cir.2002), *cert. denied*, 539 U.S. 941 (2003).

32

In *Joe's Stone Crabs,* the EEOC brought an action against the restaurant under Title VII, contending that the restaurant intentionally discriminated against four female applicants, none of whom actually applied for a position during the actionable time period.  The Eleventh Circuit ruled that the actionable period was 300 days prior to the filing of the EEOC's discrimination charge:

> The EEOC, however, argues that the discrimination in this case constituted a continuing violation, which extended the limitations period beyond [the 300-day limit].  In determining whether a discriminatory employment practice constitutes a continuing violation, 'we must distinguish between the present consequence of a one-time violation, which does not extend the limitations period, and the continuation of the violation into the present, which does.' ... The disparate treatment claims asserted by the EEOC fall into the former category.  The alleged acts at issue - the failure to hire the claimants because they were women - were discrete, one-time employment events that should have put the claimants on notice that a cause of action had accrued.  *See Morgan*, 122 S.Ct. at ____.

*Id.* at 1271-1272.  Even though none of the women had applied for a job at the restaurant during the 300 days prior to the EEOC charge of discrimination, the Eleventh Circuit held:

> ... Our precedent demonstrates that a non-applicant may ... establish a prima facie case by showing that she refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture ... To have a 'justifiable belief' for purposes of this exception to the application requirement, a person must demonstrate: (1) that she had a real and present interest in the job for

> which the employer was seeking applications;
> and (2) that she would have applied for the
> job but effectively was deterred from doing
> so by the employer's discriminatory
> practices.

*Id.* at 1274.  After concluding that the EEOC had carried its burden with respect to two of the women, the Eleventh Circuit reversed the district court's award of backpay beginning prior to the 300-day period.  *Id.* at 1276.  K5 asserts that "[n]othing could be a more clear example of the issue presented to the court here."

The EEOC and Intervenors further argue that Congressional intent supports a finding of liability beyond the 300-day statute of limitations.  They refer to the 1972 amendment to 42 U.S.C. § 2000e-5(g) prohibiting accrual of backpay more than two years prior to the filing of the charge of discrimination and cite *Thompson v. Sawyer*, 678 F.2d 257, 290-291 (D.C.Cir.1982):

> The legislative history of Congress' decision
> to limit Title VII compensation to two years
> further supports our decision to allow back
> pay awards to take into account the effects
> within the accrual period of illegal
> discrimination that came before.  By in
> effect imposing a statute of limitations on
> Title VII, Congress intended to protect
> employers against the 'enormous monetary
> penalties' that might result from 'indefinite
> liabilities.'  H.R.Rep.No. 238, 92d Cong.,
> 1st Sess. 66 (1971) U.S.Code Cong. & Admin.
> News 1972, p. 2175 (minority views).

Because courts are "'obliged to give effect, is possible, to every word Congress used,'" and to reject "'interpretations that would render a statutory provision surplusage or a nullity'", *Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d

34

1162, 1175 (9th Cir.2006), the EEOC and Intervenors argue:

> Congress's limitation of backpay to two years
> is only comprehensible if a plaintiff can
> recover relief for discriminatory acts prior
> to the 300 day limitation period.  That is
> because backpay is only available in cases
> based upon wrongful termination, demotion,
> constructive discharge, failure to hire or
> failure to promote.  Calculation of backpay
> runs from the date of the wrongful employment
> action.  If recovery were limited to wrongful
> acts within the 300 day charge-filing period,
> ... there would be no reason for Congress to
> enact a two-year (*i.e.*, 730-day) backpay
> limitation.

K5 responds that this argument is an attempt to show that the Supreme Court's opinion in *Morgan* was wrongly decided and that the court "should reject the EEOC's backhanded effort to evade the clear directive of the Supreme Court to restrict application of the continuing violation doctrine."  K5 further asserts that, "[f]rom the facts presented by the EEOC in their Opposition and supporting declarations, it is clear that the allegedly objectionable hiring decisions were immediate, unequivocal, and final, with no avenue of appeal" and that "[i]t is difficult to conceive of a more discrete act of explicitly informing an applicant that she will not and cannot be hired because of her gender."[3]

**3.  Conclusion.**

---

[3]In its Supplemental Brief filed after the hearing, K5 refers to several unpublished rulings from various United States District Courts which K5 contends support its position.  However, this court is not bound by any ruling of another District Court and unpublished decisions are not citable as precedent under the applicable rules of court.

This is a difficult issue to resolve.  The law is anything but clear.  K5's basic premise is that the Supreme Court's decision in *Morgan* precludes <u>any</u> continuing violation doctrine if the underlying acts of discrimination are a failure to hire.  However, the Supreme Court in *Morgan* did not address the continuing violation doctrine based on systematic, company-wide discrimination and, as noted above, the Ninth Circuit has indicated in cases following *Morgan* that such a theory may be sustainable depending on the evidence.  It is apparent that the EEOC and the Intervenors have selected 1998 as the starting point for the class and for damages based on the Supreme Court's holding in *Teamsters*.  K5, with its assumption *arguendo* of facts supporting the EEOC's and Intervenors' position, attempts to present this solely as a question of law.  It is not.  Pattern or practice or systemic violations that have the potential to extend claims to the time during which the practice or systemic violations occurred.  This requires factual development through discovery.  Foreclosing pre-limitations period claims is premature on this record.

K5's motion for summary adjudication as to the applicable statutes of limitations is DENIED without prejudice.

**B.   Intervenors' Motion for Class Certification.**

      **1.   Rule 23(a) Requirements.**[4]

---

[4]The EEOC is exempt from the requirements of Rule 23.  *See General Telephone Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 333-334 (1980)("The EEOC may seek class wide relief under § 706(f)(1) without being certified as the class representative under

Certification of a class of plaintiffs is governed by Federal Rule of Civil Procedure 23(a), which states in pertinent part that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all."  As a threshold matter, in order to certify a class, a court must be satisfied that

> (1) the class is so numerous that joinder of all members is impracticable (the "numerosity" requirement); (2) there are questions of law or fact common to the class (the "commonality" requirement); (3) the claims or defenses of representative parties are typical of the claims or defenses of the class (the "typicality" requirement); and (4) the representative parties will fairly and adequately protect the interests of the class (the "adequacy of representation" requirement).

*In re Intel Secs. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981)(citing Fed. R. Civ. P. 23(a)).

In opposing the application of the Rule 23(a) factors, K5 addresses only the "numerosity" requirement, stating that "it does appear that [plaintiff/intervenors] can establish the remaining requirements for class certification based upon the allegations in the Complaint in Intervention."  K5, however, asserts that it "reserves the right to move to decertify the class should any conflicts of interest arise between the class representatives and the class, or class counsel and the class."

### (1) **Numerosity**.

The numerosity requirement demands "examination of the

Rule 23; the EEOC may maintain its § 706 civil actions for the enforcement of Title VII and may seek relief for a group of aggrieved individuals without first obtaining class certification pursuant to Federal Rule of Civil Procedure 23.").

37

specific facts of each case and imposes no absolute limitations. *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Nevertheless, "Plaintiffs must show some evidence of or reasonably estimate the number of class members. Mere speculation as to satisfaction of this numerosity requirement does not satisfy Rule 23(a)(1)." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D.Cal.1999).

Intervenors assert that it is "readily apparent" that the size of the class will measure in the hundreds, referring to the evidence that K-5 employed almost 300 persons during the years 1998 through 2003. Intervenors contend that "[i]n view of the fact that the allegations and scope of the putative class extend over many years, the potential size of the class will necessarily exceed over one hundred individuals ...."

In challenging the requested class certification, K5 focuses primarily on the "temporal scope" of the proposed class. Specifically the request that the class be defined to run from January 1998. In so contending, K5 cites 4 Larson, Employment Discrimination, 2d Ed., § 81.09[2], that "courts follow an initial rule that the class may include only those individuals whose claims are not foreclosed by the Title VII statute of limitations and who therefore could have filed charges with the EEOC in a timely manner on the date that the actual class representative filed charges." This issue is discussed above. K-5 further asserts:

> Intervenors ask the court to presume

38

> numerosity by assuming that hundreds of women
> were denied jobs on or after the opening date
> for the class without presenting any evidence
> regarding the number of job openings during
> the actionable period, the number of women
> who applied for or were deterred from
> applying during that period, or the
> percentage of the workforce that would be
> female absent any discrimination.  This falls
> short of their burden.

Intervenors respond that even if the court rules for K-5 on the issue of continuing violation and the actionable period, K-5 admits that the claims would reach back to February 15, 2003, making a minimum of three years of applicants or deterred applicants who will comprise the class.  Reference is also made to K-5's admissions set forth above that K-5 employed nearly 300 employees during each of the years 1998-2003.  Intervenors contend that it is "without question that the size of the class will be substantially large enough to merit proceeding as a class."

Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members.  *Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998).  Numerosity is also satisfied where joining all Class members would serve only to impose financial burdens and clog the court's docket.  *In re Intel Secs. Litig.* 89 F.R.D. at 112.  Although it appears numerosity will be met, it is prudent to permit class discovery to provide information as to the potential number of class members.

### (2) **Common Questions of Fact and Law**.

Commonality exists when there is either a common legal issue stemming from divergent factual predicates or a common nucleus of facts resulting in divergent legal theories. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Intervenors assert that the common issues of fact are whether the class member was qualified and available to perform the unskilled jobs and whether, during the applicable time, each applied or was deterred from applying because of K-5's policy of refusing employment to females.  Intervenors describe the common questions of law as including whether the denial of employment to females who applied or were deterred from applying violates Title VII and/or the FEHA.

K-5 does not dispute the showing made by the Intervenors. Even without this concession, commonality is not a demanding requirement. *Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 622 (N.D.Ill.1989).  Commonality is present.

### (2)   **Typicality**.

Typicality is satisfied if the representative's claims arise from the same course of conduct as the class claims and are based on the same legal theory. *See e.g., Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995).

Again, K-5 does not dispute the showing made by the Intervenors.  Typicality is present.

### (3)   **Fair & Adequate Representation**.

The final Rule 23(a) requirement is that the class representative fairly and adequately protect the interests of the

40

class.  This requirement has two parts.  First, the representative's attorney must be "qualified, experienced, and able to conduct the litigation."  *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Secs. Litig.*, 122 F.R.D. 251, 257 (C.D. Cal. 1998).  Second, the suit must not be "collusive" and the named Plaintiff's interests must not be "antagonistic to the class."  *Id.*

With regard to the first requirement, the Intervenors represent that class counsel include highly experienced attorneys with many years specializing in employment discrimination, including class actions.  Intervenors' attorneys include Tomas Olmos, who previously served as the Regional Attorney of the Los Angeles District Office of the EEOC, Dolores Leal, who previously served as President of the California Employment Lawyers Association, Marcos Camacho, who served for many years as General Counsel to the United Farm Workers of America, and Tom Lynch, who was employed with the EEOC for over three years.

With regard to the second requirement, Intervenors assert that there is no evidence of collusion by class representatives with K-5 or evidence of antagonism between the class representatives and the members of the class

K-5 does not dispute the showing of representativenesss made by counsel for Intervenors as proposed class counsel.  Fair and adequate representation is present.

**B.   Certification as a Mandatory Class under Rule 23(b)(1) or (b)(2).**

Once the threshold requirements of Rule 23(a) are satisfied, a class may be certified only if the class action satisfies the requirements of Rule 23(b)(1), (b)(2), and/or (b)(3).  Here, Plaintiff/Intervenors seek certification of a mandatory class under Rule 23(b)(2).

Rule 23(b)(2) permits the maintenance of a class action (assuming Rule 23(a) is also satisfied) if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

K-5 does not oppose that this requirement has been satisfied.

**C.   Conclusion.**

For the reasons stated above:

1.   K-5's motion for summary adjudication is DENIED WITHOUT PREJUDICE following discovery;

2.   Intervenors' motion for class certification is DEFERRED pending discovery to more specifically define the temporal characteristic of class members.

IT IS SO ORDERED.

**Dated:    April 18, 2007**               _____/s/ Oliver W. Wanger_____
                                           UNITED STATES DISTRICT JUDGE

42